<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SERGIO RODRIGUEZ,                      :
                                       :    Civil Action No. 11-2432 (FSH)
                  Petitioner,          :
                                       :
            v.                         :    **OPINION**
                                       :
GREG BARTKOWSKI, et al.,               :
                                       :
                  Respondents.         :

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>
Sergio Rodriguez
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Counsel for Respondents
John Edwin Anderson
Essex County Prosecutor's Office
50 West Market Street
Newark, NJ 07601

**HOCHBERG,** District Judge

        Petitioner Sergio Rodriguez, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Administrator Greg Bartkowski and the Attorney General of New Jersey.

        For the reasons stated herein, the Petition will be denied.

I.  <u>BACKGROUND</u>

A.  <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> On July 25, 1998, Alfonso Siguencia lived at 197 Garside Street, Newark, in a second floor apartment. Three or four other families lived in the building. At the time, the electricity was out on the first floor, however, a nearby streetlight illuminated the entrance to the building.

> At approximately 9:15 p.m., Alfonso and Segundo Romero, returned to Alfonso's apartment after playing volleyball at nearby Branchburg Park with four of Alfonso's nephews and others. Rodrigo Siguencia and Mario Siguencia arrived at Alfonso's apartment first, followed by Claudio Siguencia, Raul Siguencia, and Gonzalo Calle, a friend of Rodrigo's.

> Before Claudio, Raul, and Gonzalo arrived, Rodrigo and Mario went to Rodrigo's car intending to leave, at which time three males, later identified as defendants, and two females, all apparently in their late teens, walked by. While the two girls waited at a corner, the males approached and, according to Rodrigo, asked them for a cigarette. After he responded that they had no cigarettes, the three males asked Rodrigo and Mario for money. Rodrigo responded that they earned their money and had none to give. A fight then broke out. Alfonso who had witnessed these events from his porch got up and walked over to the scene where his nephews and the three males had gathered. At this point, Claudio, Raul, and Gonzalo arrived.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

After being hit in the face, Rodrigo took his belt off and chased the three males, who ran away with the two girls. Maria Chaves was with a friend on Garside Street in the vicinity of Alfonso's apartment. She saw the three men and two girls leave and heard one of the men state "go hide because I am coming back." She called the police.

After the assailants left, Rodrigo asked Alfonso if he could use Alfonso's bathroom. Alfonso escorted Rodrigo up to his apartment. When Alfonso returned downstairs, he saw a group of about fifteen men arrive. The group, which included the three men involved in the prior incident, attacked all of the Siguencias. Alfonso called for his nephews and friends to come inside; Gonzalo and Raul were the first to enter, and then friends and family followed, but the assailants, armed with knives and bats, followed and kicked open the door to the building.

Gonzalo, who was at the front door, was stabbed in the heart and lung. Claudio, after being hit in the head with a piece of wood by Rodriguez and kicked by three assailants, got up and saw Alfonso with blood on his shirt. Claudio was then stabbed in the back. As three assailants attempted to pull Claudio outside, he managed to escape, with part of his kidney protruding through his knife wound. Claudio also saw defendant Luis DeJesus stab Alfonso.

Meanwhile, Alfonso engaged one of the attackers. However, he was hit with a bat from behind and was eventually stabbed in the stomach. According to Alfonso, he saw the three defendants stab Gonzalo and Claudio. As Alfonso attempted to retreat up the stairs to his apartment, he was stabbed in the leg. He was also stabbed in the chest. Claudio also retreated upstairs, but fell unconscious. When Rodrigo returned from the bathroom, he saw Alfonso bleeding and Claudio lying on the second story landing, also bleeding. Mario sustained fatal wounds during the attack.

In court, Alfonso identified Luis DeJesus as one of the individuals who stabbed Claudio. He also identified two males who were in the visitors' section of the courtroom as assailants; they were not defendants. He admitted that it was dark on the first floor, but claimed that sufficient light came from

outside since the front door was open. He lost consciousness after the attack for three days and was hospitalized for six days.

Rodrigo, uninjured, chased after the attackers. He confronted an individual, who was tall with a shaved head, and who produced a knife. Rodrigo retreated across the street. He described one of the attackers to the police as being eighteen to nineteen years old, about five feet six inches tall, wearing a white shirt, jean shorts, and white sneakers. Rodrigo also gave a description of a second assailant as having a thin beard, twenty to twenty-one years old, wearing blue jeans, a white shirt, and a baseball cap. Rodrigo admitted that he did not see who stabbed any of the victims. He also testified that neither he nor Mario made any untoward statements to the two women at the time of the first encounter.

Claudio identified Luis in court as one of the individuals who stabbed Alfonso. He believed Rodriguez was the individual who hit him with a piece of wood. However, he could not identify anyone for the police shortly after the attack, because he was still on medication. Nevertheless, he was one hundred percent sure of his in-court identification of Luis. A different individual stabbed him and Alfonso from behind. He did not know who stabbed him nor did he see who stabbed Mario. Claudio lost his kidney and was unconscious and in a coma for several days. He stated that he was "100 percent" certain that the three defendants were responsible for the stabbings.

Gonzalo admitted that it was dark inside the building and that he could not see well. He was shown photographic arrays following the altercation but could not identify any of the assailants.

According to A. Wayne Williams, M.D., an assistant medical examiner, Mario Siguencia suffered two major injuries. The first, which was fatal, resulted from a stab wound to the left side of his chest that pierced the skin, muscle, two ribs, part of the left lung, the sac surrounding the heart, the heart itself, and a part of the liver. The knife used to kill Mario was a single-edged knife. The second stab wound was in the right groin area.

4

Adelino Benavente, an officer with the Newark Police Department, responded to the scene that night. He noted blood throughout the crime scene and spoke with various witnesses. Manny Garcia, the lead detective on the case, also found blood throughout the site. Garcia prepared photographic arrays, including photographs of Alexis and Luis, and showed them to various witnesses. However, no identifications were made at that time. No bats or knives were found at the scene.

The police began to interview individuals whom they believed had information regarding the murder. On August 14, 1998, Quetsie Rivera gave a statement to detective Sheila Hobson of the Essex County Prosecutor's Office. Rivera did not voluntarily speak with the police. Rather, she was arrested based on a tip that she was with Alexis and Luis. Rivera claimed that Hobson told her that if she did not give a statement, the police would take her children from her and she would receive a thirty-year jail term for harboring fugitives[.] She testified that, despite the foregoing, her statements to the police were true.

In her statement, Rivera admitted that both DeJesus brothers had stayed at her house following the attack. During their stay, Luis told Rivera that he had hit some guys with a stick and stabbed a couple guys on Garside Street on July 25. He also told her that one victim attempted to run up the stairs in the building, that he ran after the victim and stabbed him in the back. She stated that when Luis described this incident, he was "laughing, like he didn't care ." Alexis told Rivera that every time a victim fell to the floor during the attack, he would "shank them up," meaning he would stab them. Rivera described Luis as being chunky on August 14, 1998, with a large stomach and buttocks, "Chinese looking eyes," a beard, and tattoos. Alexis was skinny with no facial hair.

Millian Santiago was interviewed by the police on August 20, 1998. She was eventually charged with harboring fugitives and obstructing justice. However, these charges were reduced and resolved in municipal court, where she was given a probationary sentence. Santiago also claimed that she did not give her statement willingly. She too claimed that threats were made against her and her family unless she spoke.

5

Specifically, she allegedly was told that DYFS would take custody of her five-year-old handicapped child. Nevertheless, she acknowledged that the statement she gave the police and her testimony in court were truthful. Santiago testified that after the incident Luis and Alexis disappeared for two or three days, but thereafter, they stayed with her for one day.

On August 14, 1998, Rodriguez's girlfriend, Yvalisse Rivera, gave a statement to the police. At trial, Yvalisse testified that her statement to the police was untrue, that she gave it only because the prosecutor's office threatened her. Following a hearing pursuant to State v. Gross, 121 N.J. 1, 577 A.2d 806 (1990), the judge admitted her statement as a prior inconsistent statement, and it was read to the jury by Hobson.

In the statement, Yvalisse claimed that she and another girl, "Tabitha," were with the three defendants, returning from a pizzeria, when they saw a group of Hispanics near the corner of Fourth and Garside on July 25. Luis made fun of them, since they spoke a different dialect of Spanish. The three defendants crossed the street after one of the Hispanic individuals asked why Luis made fun of them. A few minutes later, Yvalisse saw one of the Hispanics remove his belt and swing at her friends. The three defendants and two women ran away. She heard Luis tell one of the Hispanics to wait for him.

Alexis and Luis enlisted two men to join them. Luis had a double-bladed knife (i.e., sharp blades on both sides), and one of the two new men had a bat. Yvalisse begged Rodriguez, whose nickname was "Macho," not to return to 197 Garside, however, he told her he had no choice. Yvalisse accompanied the group to 197 Garside. She saw Luis force open the door to the building and he and the others entered the building. She saw some men run upstairs in the building, although she could not identify them.

Yvalisse next saw the three defendants after the fight. Luis had a bloody knife, and Rodriguez had an expression on his face, which led her to believe that something bad had happened. She said her "heart just dropped." She also noted that although Alexis left wearing sneakers, he had none on his return. Rodriguez

told her that he fought with one of the Hispanics they had met previously. He told her that one victim was stabbed on the stairs and another one was stabbed in an upstairs apartment. Rodriguez also told her that three or four people got stabbed.

Also in her statement, Yvalisse revealed that Luis said what he did was "cool," as if he had no conscience. Luis further told her that a guy hit him, "so that nigger had to wear it." Luis also confided that he had stabbed someone. Finally, Luis joked that the victims were "crying on the floor and jumping up like fish." Yvalisse also related that, at the time of her statement to the police, Rodriguez was in Puerto Rico because his sister was ill.

Yvalisse identified both Luis and Alexis in photographic arrays. No photographs of Rodriguez were shown to her. Yvalisse testified in court that her statement was based on responses suggested to her by Hobson during the interview. Yvalisse also testified that the police entered her home in the early morning hours on August 14 looking for Rodriguez, without a warrant.

On August 19, 1998, Rodriguez turned himself in. Yvalisse was present at the time. Rodriguez was interviewed and repeated the story that he and the other defendants, together with the two women, ran into the Siguencias near 197 Garside. He conceded that he and the others returned to Alfonso's apartment after the initial disagreement; however, he claimed that he had no weapons other than his teeth, which he used during the fight that ensued. He claimed he saw no weapons and did not know who had weapons or who committed the stabbings. The following day, he took a planned trip to Puerto Rico to be with his ailing sister.

Alexis and Luis were arrested together on August 25, 1998, and interviewed by Garcia. Alexis stated that he was walking home from a pizzeria with his brother Luis, his wife Tabitha, Rodriguez, and Rodriguez's "wife" (Yvalisse), when they passed the Siguencias. One of the Siguencias got fresh with Rodriguez's wife. Nevertheless, according to Alexis, the group continued to walk until he was hit with a belt buckle. He ran, but saw that there was a brief fight behind him.

7

He then returned with a group of individuals. He saw some of them run into the house, at which time he stayed outside. He saw no fighting inside or outside, noting that it was dark inside the building. He fought with no one, saw no knives, and eventually returned home. He saw no stabbings and denied stabbing anyone. The next day he learned about the stabbing, and that the police were looking for him. He stayed with friends until he was arrested.

Luis related a similar version respecting the first encounter with the Siguencias. When he and the others returned to 197 Garside, the Siguencias were on the porch waiting, and a fight ensued. He was punched and then left. He saw no stabbings, knives, or blood at the scene. After learning later that someone was killed, he became scared and went into hiding until his arrest.

(Answer [14], Ex. 7, Opinion of Superior Court of New Jersey, Appellate Division, at 5-16 (Feb. 17, 2004).)

B.   Procedural History

Following a jury trial in the Superior Court of New Jersey, Law Division, Essex County, Petitioner was convicted of second degree burglary, contrary to N.J.S.A. 2C:18-2 (count one); second-degree aggravated assault, contrary to N.J.S.A. 2C:12-1b (count two); fourth-degree aggravated assault, as a lesser-included offense of second-degree aggravated assault (counts three and four); conspiracy to commit murder, contrary to N.J.S.A. 2C:5-2 and 2C:11-3 (count five); second-degree reckless manslaughter, as a lesser-included offense of purposeful or knowing murder (count six); felony murder, contrary to N.J.S.A. 2C:11-3(a)(3) (count seven); and possession of a weapon with an unlawful purpose, contrary to N.J.S.A. 2C:39-5d (count nine).

On July 14, 2000, Petitioner was sentenced to an aggregate term of thirty-eight and one-half years' imprisonment, subject to thirty-six years of parole ineligibility.  On February 17, 2004, the Superior Court of New Jersey, Appellate Division, affirmed. On June 4, 2004, the Supreme Court of New Jersey denied certification.  State v. Rodriguez, 180 N.J. 452 (2004). Petitioner did not seek a writ of certiorari from the United States Supreme Court.

Petitioner timely filed a petition for post-conviction relief ("PCR") in the trial court in May 2005.  Following oral argument, the PCR court denied relief on August 4, 2008. (Answer, Ex. 12.)  The Appellate Division affirmed the denial of relief on October 27, 2010, State v. Rodriguez, 2010 WL 4226170 (N.J. Super. App.Div. Oct. 27, 2010), and the Supreme Court of New Jersey denied certification on March 24, 2011, State v. Rodriguez, 205 N.J. 518 (2011).  This Petition followed.[2]

---

[2] Respondents contend that this Petition is not timely because it was not filed by August 31, 2005.  (Answer, Affirmative Defenses, p. 97.)  Contrary to Respondents' contention, this Petition appears timely.  The conviction became final on September 2, 2004, ninety days after the Supreme Court of New Jersey denied certification on June 4, 2004, when the time for filing a petition for writ of certiorari with the Supreme Court expired.  See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.  According to the Appellate Division, Petitioner filed his first state PCR petition on or about May 23, 2005, when he had 103 days remaining on the federal one-year habeas limitations period, and it was deemed timely in state court.  See State v. Rodriguez, 2010 WL 4226170, *1 n.1.  Thus, that state PCR petition tolled the federal limitations period so long as it

Petitioner asserts the following grounds for relief: the state's motion to amend the indictment should not have been granted (ground four); prosecutorial misconduct, in the form of a reference to the "Latin Kings" gang by a government witness (ground five);[3] the trial court's jury charges regarding aggravated assault, accomplice liability, and felony murder were improper (ground two); the jury charge regarding identification

_____

was pending.  See 28 U.S.C. § 2244(d)(2).  After Petitioner advised the state PCR court of his concerns regarding the brief filed by counsel, the state PCR petition was voluntarily dismissed without prejudice on May 11, 2007, with leave to apply to re-open until December 23, 2007.  (Answer, Ex. 14, at Da64.) Petitioner filed a brief in support of his Petition seven days later, on May 18, 2007; it is not clear from the record before this Court when, if ever, Petitioner's counsel filed a more formal motion to re-open.  The state PCR court ordered the PCR matter "reinstated" on May 28, 2008.  Thus, based upon the record before this Court, at most seven days are chargeable to Petitioner for this interruption in the post-conviction proceedings.  (Answer, Ex. 14, at Da69-112; Ex. 14A at 9a-10a.) Petitioner's state post-conviction relief proceedings terminated on March 24, 2011, and this Petition is deemed filed nineteen days later, on April 12, 2011, when it was placed in the prison mailing system, well within the 97-104 days remaining on Petitioner's one-year limitations period.  In any event, however, the Petition is meritless, as discussed more fully, infra.

[3] Respondents answer this claim for relief with reference to the litigation, in state court, of various other asserted forms of prosecutorial misconduct.  In the Petition, however, Petitioner refers solely to the "Latin Kings" testimony. Accordingly, this Court construes the Petition as asserting only that claim of prosecutorial misconduct.  To the extent the Petition could be construed as asserting other claims of prosecutorial misconduct litigated in state court, this Court finds that the decision of the Appellate Division with respect to those claims, see Answer, Ex. 7, Opinion of Appellate Division at 31-35, was neither contrary to nor an unreasonable application of Supreme Court precedent and that Petitioner is not entitled to relief with respect to any claims of prosecutorial misconduct.

was inadequate (ground three); ineffective assistance of trial
counsel (ground seven); the conviction is against the weight of
the evidence and the trial court erred in denying Petitioner's
motion for acquittal (ground one); cumulative error rendered the
trial unfair (ground nine); the sentence is excessive (ground
six); ineffective assistance of appellate counsel (ground eight);
and ineffective assistance of counsel in connection with post-
conviction relief proceedings.[4]  Briefing is complete and this
matter is now ready for decision.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty
Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent
part:

> (a) The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an
> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of
> the United States.

> With respect to any claim adjudicated on the merits in state
court proceedings, the writ shall not issue unless the
adjudication of the claim

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly

---

[4] Ineffective assistance of counsel in state collateral
post-conviction relief proceedings is not a ground for relief in
a federal habeas corpus action.  See 28 U.S.C. § 2254(i).

established Federal law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court
precedent "if the state court applies a rule that contradicts the
governing law set forth in [Supreme Court] cases," or "if the
state court confronts a set of facts that are materially
indistinguishable from a decision of th[e] Court and nevertheless
arrives at a result different from [the Court's] precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,
for the Court, Part II).  A state court decision "involve[s] an
unreasonable application" of federal law "if the state court
identifies the correct governing legal rule from [the Supreme]
Court's cases but unreasonably applies it to the facts of the
particular state prisoner's case," and may involve an
"unreasonable application" of federal law "if the state court
either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  Id. at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.

12

Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).  In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA."  Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)).  "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence."  Simmons v. Beard, 581 F.3d 158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

An petition for writ of habeas corpus shall not be granted unless the petitioner has exhausted the remedies available in state court.  28 U.S.C. § 2254(b)(2).  A petition may be denied on the merits, however, notwithstanding the petitioner's failure to exhaust his state court remedies.  See Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

III.   ANALYSIS

A.   The Motion to Stay

In February 2013, after briefing in this matter was completed, Petitioner filed a Motion [23] to stay this Petition to permit him to exhaust, in state court, a new claim that has not been asserted in this Petition.

> Petitioner submits 1 unexhausted issue was not raised by any of petitioner's counsels through out all his proceedings.  With the help of a paralegal here at the prison and petitioner pouring over the [trial] transcripts, only then was petitioner able to discover these unexhausted issues.  And petitioner was denied a evidentiary hearing in state court in which petitioner's exhausted issues was clearly related to constitutional issues concerning failures of trial and [appellate] counsel.  Petitioner also submits that assigned PCR counsel failed to raise this issue and did not communicate with petitioner concerning the unexhausted issue.  Petitioner's unexhausted issue is as follows:  Defendants PCR counsel failed to raise trial judges unconstitutional comments in the supplemental jury charge which tainted the jury process.  The trial court judge in defendants case conveyed both blunt and subtle pressure upon the jury, this pressure was inconsistent with the jury's freedom and responsibility to return a verdict independent of such judicial coercion or coercion period.  Such coercion violated defendants State and Federal Constitution.  For this unexhausted issue Petitioner seeks a stay and abeyance.

(Motion to Stay at 5-6.)

The exhaustion requirement of § 2254(b)(2) is a "total exhaustion" rule; that is, all claims presented in the federal habeas petition must have been exhausted in state court.  Rose v. Lundy, 455 U.S. 509 (1982).  At the time Lundy was decided, there was no statute of limitations on the filing of federal habeas

petitions.  The enactment in 1996 of a one-year limitations period for § 2254 habeas petitions,[5] however, "'has altered the context in which the choice of mechanisms for handling mixed petitions is to be made.'"  Crews v. Horn, 360 F.3d 146, 151 (3d Cir. 2004) (quoting Zarvela v. Artuz, 254 F.3d 374, 379 (2d Cir.), cert. denied, 534 U.S. 1015 (2001)).  Because of the one-year limitations period, dismissal of a timely-filed mixed petition may forever bar a petitioner from returning to federal court.  "Staying a habeas petition pending exhaustion of state remedies is a permissible and effective way to avoid barring from federal court a petitioner who timely files a mixed petition."  Crews, 360 F.3d at 151.  Indeed, the Court of Appeals for the Third Circuit has held that "when an outright dismissal could jeopardize the timeliness of a collateral attack, a stay is the only appropriate course of action."  Crews, 360 F.3d at 154.

The Supreme Court has somewhat limited the stay-and-abeyance rule announced in Crews.

> [S]tay and abeyance should be available only in limited circumstances.  Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.  Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

---

[5] See 28 U.S.C. § 2244(d).

16

...

      On the other hand, it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.  In such circumstances, the district court should stay, rather than dismiss, the mixed petition.  ...  For the same reason, if a petitioner presents a district court with a mixed petition and the court determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief.

Rhines v. Weber, 544 U.S. 269, 277-78 (2005) (citations omitted).[6]

Here, the Court is not faced with a "mixed" petition, nor is the Court faced with a petition asserting solely unexhausted claims protectively filed during the pendency of state post-conviction proceedings, see, e.g., Heleva v. Brooks, 581 F.3d 187 (3d Cir. 2009) (stay-and-abeyance procedure may be used with respect to protectively-filed federal habeas petition whose

---

[6] Even where stay and abeyance is appropriate, the district court's discretion in structuring the stay is limited by the timeliness concerns reflected in the one-year statute of limitations.  "Thus, district courts should place reasonable time limits on a petitioner's trip to state court and back."  Id. at 278.  See also Crews, 360 F.3d at 154 ("If a habeas petition is stayed, the petitioner should be given a reasonable interval, normally 30 days, to file his application for state post-conviction relief, and another reasonable interval after the denial of that relief to return to federal court.  If a petitioner fails to meet either time-limit, the stay should be vacated nunc pro tunc.") (citations omitted).

claims are wholly unexhausted).  Instead, here Petitioner
requests a stay so that he can exhaust in state court a new claim
that has not been asserted at all in this Petition.[7]

Moreover, Petitioner has failed to demonstrate either good
cause for his failure to exhaust this claim or that the claim is
potentially meritorious.  With respect to his obligation to
establish good cause for failure to exhaust this claim,
Petitioner does not state when he first obtained a copy of the
relevant transcripts, or describe the nature of his discussions
with trial, appellate and PCR counsel regarding the jury
instructions, or state when he first considered that the
allegedly inappropriate language might be a ground for relief
from his conviction, or when (if ever) he raised this claim in
state court, or what the status of any state court proceeding is.
Contrary to his obligation to establish that the claim is
potentially meritorious, Petitioner has described the claim in
only vague terms.  He does not identify or describe the allegedly
inappropriate language in the jury instructions or explain how

_____

[7] It is not at all clear that Petitioner could amend the
pending Petition to assert this new claim.  See, e.g., Mayle v.
Felix, 545 U.S. 644 (2005) ("An amended habeas petition, we hold,
does not relate back (and thereby escape AEDPA's one-year time
limit) when it asserts a new ground for relief supported by facts
that differ in both time and type from those the original
pleading set forth.").  Although described in only vague terms,
it seems that the new claim is completely unrelated to the claims
already asserted regarding alleged defects in the jury
instructions.

such language was "coercive."  Most importantly, Petitioner does not explain how this newly-raised alleged defect in the jury instructions was so significant that it amounted to a violation of his due process rights.  See generally Estelle v. McGuire, 502 U.S. 62, 72-73 (1991), discussed more fully infra.  Under these circumstances, this Court cannot find that it would be appropriate to stay this proceeding in order to permit Petitioner to return to state court to pursue this new unexhausted claim.

Because the Petition as filed by Petitioner, and answered by Respondents, does not contain this new unexhausted claim, it is not necessary for the Court to grant Petitioner leave to advise the Court whether he wishes to withdraw any unexhausted claims. See McMillan v. Bartkowski, Civil No. 11-1586, 2012 WL 938160, *6 (D.N.J. March 20, 2012).  Therefore, this Court will proceed to determine the Petition as filed and answered.

B.    The Amendment of the Indictment

Petitioner asserts that he was prejudiced by the trial court's granting of the State's motion to amend the indictment during trial.

The Appellate Division rejected this claim of error on direct appeal.

> Realizing after presenting its evidence, that aggravated assault does not qualify as a predicate offense to felony murder under N.J.S.A. 2C:11-3a(3), the State moved to amend the seventh count of the indictment to allege felony murder based upon the predicate offense of burglary.  All defendants

19

objected.  The trial judge granted the motion.
Rodriguez contends that the judge erred in permitting
the State to amend the indictment during the course of
trial.  We disagree.

Article I, ¶ 8, of the New Jersey Constitution
provides that, except in certain cases not relevant
here, "[n]o person shall be held to answer for a
criminal offense, unless on the presentment or
indictment of a grant jury . . . ."  Article I, ¶ 10,
provides that "[i]n all criminal prosecutions the
accused shall have the right . . . to be informed of
the nature and cause of the accusation . . . ."  R.
3:7-3(a) requires that an indictment provide "a written
statement of the essential facts constituting the crime
charged . . . ."

The three-fold purpose of an indictment is: (1) to
provide adequate notice so that the accused can prepare
a satisfactory defense; (2) to be sufficiently specific
for the accused to avoid a subsequent prosecution for
the same offense; and (3) to be adequately precise to
preclude the trial jury's substitution of an offense
which the grand jury did not in fact consider or
charge.  State v. LeFurge, 101 N.J. 404, 415 (1986);
State v. Mello, 297 N.J. Super. 452, 462 (App. Div.
1997).  An indictment must allege the essential
elements of the crime charged.  State v. N.L., 253 N.J.
Super. 13, 19 (App. Div. 1991),certif. denied, 127 N.J.
560 (1992); State v. Newell, 152 N.J. Super. 460, 466
(App. Div. 1977).

R. 3:7-4 provides that an indictment may be
amended as follows:

The court may amend the indictment or accusation
to correct an error in form or the description of
the crime intended to be charged or to charge a
lesser included offense provided that the
amendment does not charge another or different
offense from that alleged and the defendant will
not be prejudiced thereby in his or her defense on
the merits.  (Emphasis added.)

Under this rule, the "description of the crime may be
changed unless it is an 'essential element.'"  State v.
Walker, 322 N.J. Super. 535, 553 (App. Div.) (quoting
State v. J.S., 222 N.J. Super. 247, 258 (App. Div.),

20

certif. denied, 111 N.J. 589 (1988)), certif. denied,
162 N.J. 487 (1999).  Moreover, an indictment may be
amended "to correct an error in form or the description
of the crime intended to be charged," as long as the
original indictment sufficiently informed defendant of
the charges against him or her.  State v. Orlando, 269
N.J. Super. 116, 138 (App. Div. 1993), certif. denied,
136 N.J. 30 (1994).

    In this case, all defendants were charged with
burglary in the first count of the indictment.
Therefore, the first count of the indictment could have
served as the predicate offense for the felony murder
charge.  The charge of burglary was not new to the
case.  Defendants had defended against the burglary
charge throughout the case.  The amendment of the
felony murder count was made at the close of the
State's case.  As the judge pointed out, the only
change wrought by the proposed amendment would be "in
the assemblage of [the] allegations [against
defendants]," in that the felony murder count would now
reference burglary rather than aggravated assault.
Under these circumstances, defendant "clearly had an
adequate opportunity to defend the amended felony
murder charge."  Walker, supra, 322 N.J. Super. at 554.
Here, unlike the facts in State v. Branch, 155 N.J.
317, 323 (1998), defendants were charged with burglary
in the indictment and received reasonable notice at
trial that the State would rely on that offense as the
predicate for felony murder.  We are satisfied that the
defense did not suffer any prejudice nor was it
surprised by the amendment to the indictment.  See
State v. Smith, 279 N.J. Super. 131, 147 (App. Div.
1995).

(Answer. Ex. 7, Opinion of Appellate Division at 48-51.)

    The Sixth Amendment provides, in relevant part, that "[i]n

all criminal prosecutions, the accused shall enjoy the right ...

to be informed of the nature and cause of the accusation."  This

right does apply to the states through the Due Process Clause of

the Fourteenth Amendment.  See Faretta v. California, 422 U.S.

806, 818 (1975).  As explained by the Supreme Court, the

sufficiency of a charging instrument is measured by two criteria: "first, whether [it] contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." Russell v. United States, 369 U.S. 749, 763-64 (1962) (quotation marks and citations omitted).[8]

The decision of the Appellate Division, that Petitioner was provided adequate notice of the charges against him and that he was neither surprised nor prejudiced by the amendment of the indictment at trial, is neither contrary to nor an unreasonable application of controlling Supreme Court precedent.  Petitioner is not entitled to relief on this claim.

---

[8] The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grant Jury[.]"  The Fifth Amendment right to an indictment by a Grand Jury does not, however, apply to state criminal prosecutions.  See Apprendi v. New Jersey, 530 U.S. 466, 477 n.3 (2000); Albright v. Oliver, 510 U.S. 266, 272 (1994); Hurtado v. California, 110 U.S. 516 (1884).  Because the Due Process Clause of the Fourteenth Amendment has not been construed to incorporate the Fifth Amendment right to indictment by a Grand Jury, the legality of an indictment is generally a matter of state law. See U.S. ex rel. Wojtycha v. Hopkins, 517 F.2d 410, 425 (3d Cir. 1975).

C.   <u>Prosecutorial Misconduct</u>

Petitioner asserts that a government witness improperly made references to the "Latin Kings" gang, contrary to a pre-trial agreement that the prosecutor would instruct his witnesses not to make such references.  Petitioner characterizes this event as prosecutorial misconduct which denied him a fair trial.

This claim was raised on appeal not by Petitioner, but rather by his co-defendants.  Nevertheless, the issue was considered and rejected by the Appellate Division in the consolidated appeals.

> Luis and Alexis claim that the judge erred by not granting their motions for mistrial.  Before trial began, Rodriguez's counsel informed the judge that all counsel had agreed that there would be no mention of a gang called the Latin Kings, due to the potential prejudice it could generate.  The prosecutor indicated that he instructed his witnesses not to refer to the gang.

> Despite the foregoing pretrial colloquy and a specific instruction from the prosecutor, Alfonso Siguencia, who testified in Spanish with the aid of an interpreter, referred in Spanish to the Latin Kings. The judge immediately interrupted the testimony, and excused the jury from the courtroom.  Rodriguez moved for a mistrial.  Denying the motion, the judge observed that the reference to the Latin Kings was "not sufficient here in a foreign language in this courtroom in these circumstances to warrant a remedy by way of mistrial."  Luis's attorney quickly pointed out that the comment was translated into English, and came out "loud and clear."[fn1]  Nevertheless, the judge again indicated that he would not grant a mistrial, stating that even though the name of the gang might have been heard by the jury in English,

>> [t]he reference to the word Latin King in and of itself, while it would be preferable to have been

23

avoided, does not necessarily mean that there's been an attribution to these defendants.

The word Latin King has been used once in the course of the trial and the statement that it was being used in was terminated midway in Spanish by the -- by the Court.  The procedure that we outlined and is to be followed must still be followed.  This one reference is not sufficient in and of itself to warrant a mistrial here.

[fn1] The actual testimony of which Luis and Alexis complain does not appear in the transcript.

The jury, which had been excused, was then instructed by the judge to disregard the question and answer given by Alfonso before it was excused.  The judge indicated that he "suspected" that the jurors might not even recall the answered question, but told the jury "to disregard it if you do."

...

The underlying principles are well settled.  A mistrial should be granted only in a situation that would otherwise result in a manifest injustice.  State v. DiRienzo, 53 N.J. 360, 383 (1969); State v. Bogan, 297 N.J. Super. 7, 14 (App. Div.), certif. denied, 149 N.J. 142 (1997).  A reviewing court should defer to the trial court's decision, State v. Harvey, 151 N.J. 117, 205 (1997), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (1000), since the trial court is in the best position to determine the effect of the allegedly prejudicial actions.  Absent an abuse of that discretion, or proof of actual harm to defendant, the trial court's refusal to declare a mistrial should not be reversed on appeal.  State v. LaBrutto, 114 N.J. 187, 207 (1989); Hogan, supra, 297 N.J. Super. at 15.

Respecting the fleeting reference to Latin Kings, we conclude that the judge's instructions were adequate to ameliorate any significant prejudice.  State v. Marshall, 123 N.J. 1, 161 (1991), cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993).  Moreover, there is no reason to believe that the jury was unwilling or unable to follow the curative instruction as given.  State v. Manley, 54 N.J. 259,

24

270 (1969).  ...  The judge correctly refused to grant
defendants' motions for mistrial.

(Answer, Ex. 7, Opinion of Appellate Division at 35-40.)

As the issue presented has been thoroughly considered by the
State courts, this Court will exercise its discretion to deny
this unexhausted claim.  See 28 U.S.C. § 2254(b)(2).

The U.S. Supreme Court has recognized the obligation of a
prosecutor to conduct a criminal prosecution with propriety and
fairness.

> He may prosecute with earnestness and vigor – indeed,
> he should do so.  But, while he may strike hard blows,
> he is not at liberty to strike foul ones.  It is as
> much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to
> use every legitimate means to bring about a just one.
> ...  Consequently, improper suggestions, insinuations,
> and, especially, assertions of personal knowledge are
> apt to carry much weight against the accused when they
> should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line
separating acceptable from improper advocacy is not easily drawn;
there is often a gray zone.  Prosecutors sometime breach their
duty to refrain from overzealous conduct ... ."  United States v.
Young, 470 U.S. 1, 7 (1985).

Here, there is no evidence to suggest that the prosecutor
wrongfully elicited the single reference to the Latin King gang.
Nor is there any evidence to suggest that this single reference
rendered Petitioner's trial unfair in violation of the Due
Process Clause of the Fourteenth Amendment.  Cf. Minett v.

25

Hendricks, 135 Fed.Appx. 547 (3d Cir. 2005) (no irreparable prejudice from improper testimony that defendant had previously been convicted of a weapons offense).  To the contrary, the trial court immediately interrupted the single instance of improper testimony and instructed the jury to disregard it.  The denial of a mistrial under these circumstances does not violate clearly established Supreme Court precedent; Petitioner is not entitled to relief on this claim.  See id.

D.   Jury Instructions

Petitioner argues that the trial court's jury charge regarding accomplice liability (in the context of the assault and murder charges) was improper, in that it should have incorporated certain facts.[9]  Petitioner also argues that the jury charge regarding identification was inadequate because it misrepresented the facts.

The Appellate Division rejected these claims on direct appeal.

> Rodriguez asserts that the judge erred in his instructions to the jury by: (1) failing to incorporate facts into the instructions given on accomplice liability and identification and (2) by affirmatively misrepresenting facts in his identification charge. Again, the underlying principles are well settled. Proper jury instructions are essential to a fair trial. Cavanaugh v. Skil Corp., 331 N.J. Super. 134, 160 (App. Div. 1999), aff'd, 164 N.J. 1 (2000).  A trial judge is

---

[9] Petitioner does not assert that the jury charges mis-stated the elements of the charged crimes.  Accordingly, the instructions will not be set forth verbatim here.

26

obliged to give a comprehensible explanation of the questions that the jury must resolve and to inform the jury of the law applicable to the issues in the case. Myrlak v. Port Auth. of NY & NJ, 302 N.J. Super. 1, 19 (App. Div. 1997), rev'd in part on other grounds, 157 N.J. 84 (1999), certif. denied, 167 N.J. 89 (2001). Appropriate jury charges "'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them . . . .'" Velazquez v. Portadin, 163 N.J. 677, 688 (2000) (quoting Jurman v. Samuel Braen, Inc., 47 N.J. 486, 591-92 (1966)). "'When reviewing a trial court's instruction to the jury, an appellate court must read the charge as a whole' and should not reverse 'when the charge adequately conveys the law and does not confuse or mislead the jury.'" Casino Reinv. Deve. Auth. v. Lustgraten, 332 N.J. Super. 472, 487 (App. Div.) (quoting Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418 (1997)), certif. denied, 165 N.J. 607 (2000). "There is no reversible error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 464 (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)), certif. denied, 165 N.J. 607 (2000).

Essentially, Rodriguez claims that the trial judge committed reversible error by not incorporating facts into his instructions that explained Rodriguez's position regarding accomplice liability. However, the record reflects that after giving the jury the State's theory of the case in order to provide some context for his upcoming accomplice liability charge, the judge specifically told the jury that he was not endorsing and was taking no position respecting the State's theory and that defendants denied the allegations against them. Rejecting Rodriguez's objection to this charge on accomplice liability, the judge observed correctly that no defendant testified and, therefore, he had no evidence from any of them to describe to the jury. More importantly, the judge explained to the jury that defendants denied being present and participating when the stabbings took place.

Generally, "summarizing the strengths and weaknesses of the evidence is more appropriately left for counsel." State v. Robinson, 165 N.J. 32, 45 (*2000) (disapproving State v. Edmonds, 293 N.J. Super. 113 (App. Div. 1996)). Trial judges "are free to add specific factual references ... for clarity or when the court concludes that such references are required in the interest of justice." Ibid. When commenting on weaknesses in the State's evidence, a judge is "'required in the interest of fairness, to mention the State's explanations' for those weaknesses." Ibid. (Citations omitted.) "By the same token" if reference is made "to the State's evidence in any significant way," a judge "must also refer to the defendant's contrary contentions." Ibid. We find no error in the manner in which the trial judge instructed the jury on accomplice liability.

We come to the same conclusion respecting the instructions on identification. Rodriguez argues that the trial judge failed "to apply the facts of the case in the identification charge and affirmatively misrepresented facts" by giving instructions that were "totally insufficient" because the "identification evidence was inherently suspect." He further asserts that the judge "failed to note the numerous inconsistencies in both victims' testimony and [their] prior statements admitted into evidence." Again, it was not the judge's responsibility to probe the weaknesses or strengths of either side's case. Defense counsel is "look[ed] to ... not the court, to probe the State's evidence with vigor and diligence, and our adversarial system depends on counsel for that purpose." Ibid. Defense counsel did his part in vigorously cross-examining the State's witnesses and forcefully arguing in his summation that the identification was not reliable.

Here, as previously explained, the judge advised the jury that defendants denied participation in the crimes and he referred to their statements, which supported their not guilty pleas. Further, the judge discussed the evidence, including the testimony of the victims and statements of Quetsie and Yvalisse Rivera, which worked to both the advantage and disadvantage of defendant, Rodriguez. In doing so, the judge repeatedly told the jury that if its recollection of the facts differed from his, then the jury recollection

28

controlled.  The judge's comments were not overly detailed nor did they highlight or appear to advocate one side over the other.  <u>State v. Swint</u>, 328 N.J. Super. 236, 259 (App. Div.), <u>certif. denied</u>, 165 N.J. 492 (2000).  We are satisfied that the instruction given when viewed in its entirety was fair, impartial, and adequately conveyed the applicable law.  We see no reason to intervene.

(Answer, Ex. 7, Opinion of Appellate Division at 44-48.)

Generally, questions relating to jury instructions are matters of state law not cognizable in federal habeas review. See <u>Engle v. Isaad</u>, 456 U.S. 107 (1982); <u>Henderson v. Kibbe</u>, 431 U.S. 145 (1977).  Thus, even a jury instruction that is inconsistent with state law does not necessarily merit federal habeas relief.

Where a federal habeas petitioner seeks relief based upon the jury instructions given in a state criminal proceeding,

[t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

<u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73 (1991) (citations omitted).

Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Even if there is "'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation.  Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009) (internal citations omitted).

Here, the Appellate Division considered whether the challenged instructions correctly conveyed state law and found them proper.  As the Appellate Division found, the trial court's limited references to the evidence and testimony in the case,

provided to establish a context for the instructions, did nothing to relieve the State of its obligation to prove Petitioner's guilt beyond a reasonable doubt.  The decision of the Appellate Division was neither contrary to nor an unreasonable application of the controlling Supreme Court law regarding jury instructions. Petitioner is not entitled to relief on these claims.

E.   Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel failed in numerous ways to provide constitutionally adequate assistance.[10]  In addition, Petitioner asserts generally that his appellate counsel failed to provide constitutionally adequate assistance.

The Appellate Division meticulously examined each of the claimed deficiencies and rejected Petitioner's challenges.

A defendant must establish two elements to prove ineffective assistance of counsel. First, he must demonstrate that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984). Performance is

_____

[10] More specifically, Petitioner alleges that trial counsel failed to permit Petitioner to testify at the hearing pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), to determine the admissibility of his statement to police; failed to move to dismiss based on the State's opening argument; failed to move to sever Petitioner's trial from that of his co-defendants; failed to investigate potential exculpatory witnesses; failed to object to the testimony of Alfonso Siguencia; failed to conduct himself in a professional manner in front of the jury; failed to properly prepare for trial; failed to properly advise Petitioner that he should be present at trial; failed to argue self-defense; failed to move for a mistrial; failed to object to the State's summation; was ineffective with regard to the charge and recharge to the jury; and was ineffective in failing to argue effectively at sentencing.

deficient when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S.Ct. at 2064, 80 L. Ed.2d at 693. ... Second, a defendant must establish that counsel's deficiency prejudiced the defense by demonstrating that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L. Ed.2d at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ibid. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694. In order to rebut this presumption, a defendant must prove that counsel's actions did not amount to "sound trial strategy." Id. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694-95. ...

"'Judicial scrutiny of counsel's performance must be highly deferential,' and must avoid viewing the performance under the 'distorting effects of hindsight.'" State v. Norman, 151 N.J. 5, 37, 697 A.2d 511 (1997) (quoting Strickland, supra, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694). Thus, an attorney's strategy decision should not be characterized as ineffective assistance merely because the decision did not produce the desired result. See id. at 37-38. ...

IV

Against this backdrop and applying these legal principles, we now consider the arguments raised on appeal. We begin with Point I in defendant's counsel's brief, in which fourteen assertions of ineffective assistance of trial counsel are raised.

In Point I.A, defendant argues that his trial counsel was deficient for failing to permit him to testify at the Miranda hearing. We defer discussion of this issue to the next section of this opinion. ...

In Point I.B, defendant argues that his trial counsel was deficient for failing to move to exclude the use of his nickname, "Macho," during the trial. ... Further, the argument lacks substantive merit. Many of

the witnesses knew defendant only by his nickname and referred to him as "Macho" in their statements. Therefore, the use of the nickname was relevant to establish defendant's identity. ... Further, we are unpersuaded by defendant's claim of prejudice. The nickname is not inherently pejorative. Yet, defendant contends that, in the context of this case, use of the name was prejudicial. The overwhelming evidence was that all three perpetrators, after the initial encounter on the street with the other group, returned to continue the altercation. In light of that evidence, there was little or no prejudice in the use of the nickname. ...

Point I.C asserts ineffectiveness of trial counsel for failing to move to dismiss the case on the basis of the prosecutor's opening statement, during which he said, in describing the events, that the peace of the evening was interrupted when the three defendants and a couple of their girlfriends came up to a group of people and "who knows what actually happened." This issue ... lacks merit. Contrary to defendant's argument, this isolated phrase did not signify that the State admitted it could not prove what happened that night that would form the basis of a criminal conviction for defendant.

In Point I.D, defendant criticizes his trial counsel for not moving for severance. This, too, ... is substantively meritless because a joint trial is preferable when the charges emanate from the same or related acts and the factfinder will consider much of the same evidence in determining the guilt or innocence of each defendant. ... This was such a case. Any motion to sever would have surely been denied.

In Point I.E, defendant alleges that his trial counsel was ineffective for failing to investigate potential witnesses to exculpate defendant. In support of his PCR petition, defendant argued that his attorney should have sent an investigator to interview the witnesses that ultimately testified at trial. He contended that "[t]hese witnesses that were present at the scene could have supported the fact that no weapons were visible, further supporting the petitioner's assertion that he had no knowledge of any weapons." The witnesses, of course, testified at trial and were subject to cross-examination by all defense counsel.

Defendant has offered no affidavits or certifications from any of these witnesses to establish that they would have provided some testimony other than that which they gave at trial and which would have been exculpatory. Such "bald assertions," unsubstantiated by appropriate affidavits or certifications, cannot provide the basis for a finding of ineffective assistance of counsel ... .

Under Point I.F, defendant argues that his trial counsel was deficient for failing to object to certain testimony of Alfonso Siguencia. Defendant argues that Siguencia testified that "he" hit him in the head with a bat, without specifying that Siguencia was referring to defendant. It may well have been sound trial strategy to see if the victim could specify which defendant. However, objecting on that basis could easily have worked to defendant's disadvantage if the victim testified that it was defendant who wielded the bat. We will not second guess the strategic decision to leave this inconclusive testimony unchallenged. There was no deficient conduct in this regard.

In Point I.G, defendant argues that his trial counsel was deficient by failing to conduct himself in a professional manner in front of the jury. In Point I.H, defendant argues that his trial counsel was deficient because he "made no effort to obtain defendant's arrest photograph until the midst of trial." In Point I.I, defendant argues that his trial counsel failed to properly advise defendant that he should be present at trial. In Point I.J, defendant claims that his trial counsel was deficient for failing to argue self-defense. In Point I.K, defendant complains that his trial counsel should have moved for a mistrial when defendant threatened the prosecutor saying, "Slapping the shit out of his ass, man."

These arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). It is sufficient to note that there is no evidence to suggest that trial counsel's aggressive questioning of witnesses on behalf of his client constituted unprofessional conduct; defendant has made no showing as to how his arrest photograph could have aided his defense; the record reveals that trial counsel clearly advised defendant that he should remain in the courtroom during trial, and the judge questioned

defendant to assure that he realized the potential
adverse consequences of absenting himself; the defense
of self-defense was not applicable in this case; and
after defendant's vulgar outburst, the judge gave an
immediate and effective curative instruction, telling
the jurors that sometimes emotions run high and that
their verdict must be based on the evidence alone.

    The final three points, I.L (failure to object to
the State's summation), I.M (asserted ineffectiveness
with regard to the jury instructions), and I.N (failing
to argue effectively at sentencing) deal with issues
that were raised and adjudicated on direct appeal and
they are procedurally barred by Rule 3:22-5. Defendant
has offered no basis upon which the "very limited"
exception to this bar should apply. The issues raised
on these points in the PCR proceeding are either
identical or substantially equivalent to those resolved
on direct appeal. That resolution is deemed conclusive
and cannot be relitigated in a collateral proceeding.

...

V

    We now deal with the ineffective assistance claims
related to the Miranda motion. First, defendant argues
that his trial counsel was deficient for failing to
permit defendant to testify at the Miranda hearing. He
further argues that trial counsel was deficient for
failing to call defendant's girlfriend, Yvalisse
Rivera, as a witness. Finally, defendant argues that
his trial counsel should have called an expert to
explain why defendant's statement was not voluntary.

    The second issue raised with respect to the
Miranda hearing is defendant's contention that his
appellate counsel was ineffective for failing to raise
on direct appeal the argument that because a criminal
complaint had previously been issued charging defendant
with murder, failure of the police to advise defendant
of the existence of the complaint precluded, as a
matter of law, defendant's ability to knowingly and
voluntarily waive his Miranda rights. In support of
this argument, defendant points out that our Supreme
Court so held in [State v. A.G.D., 178 N.J. 56 (2003),]
on October 9, 2003, two months before his case (and his
co-defendants' cases) was submitted to this court on

35

December 17, 2003, and four months before this court
rendered a decision on February 17, 2004.

A.

With respect to the conduct of the <u>Miranda</u>
hearing, we summarily reject defendant's argument that
an expert should have been called. Defendant has
produced no report from any such expert, accompanied by
an appropriate affidavit or certification. Therefore,
this argument fails to satisfy the threshold criteria
of Cummings, and is not sustainable.

To place defendant's statement in proper
perspective, it must be noted that he presented himself
voluntarily at the prosecutor's office in the company
of his girlfriend, Yvalisse Rivera. Defendant referred
to Rivera as his "wife." She was pregnant with his
child. Shortly after the crime, defendant had traveled
to Puerto Rico. He contended this was a preplanned trip
to visit ailing family members.

Five days prior to defendant's August 19, 1998
statement, Rivera gave a statement of her own to the
police on August 14, 1998. Rivera described the events
of July 25, 1998 at 197 Garside Street, stating that
she and defendant, in the company of the DeJesus
brothers and another girl, Tabitha, encountered the
other group of individuals on the street. After a
verbal argument ensued, one of the individuals from the
other group took off his belt and started swinging it.
Defendant and the DeJesus brothers began running toward
Second Avenue. Rivera and Tabitha walked toward Second
Avenue. One of the DeJesus brothers punched one of the
other men in the face.

Rivera then gave this account of what happened
next:

We jogged up towards them. I was begging Macho not
to go back. He said he had no choice, he had to.
He also said he wished he was home. Puto [Luis
DeJesus] and Frijole [Alexis DeJesus] got two more
people along with Macho. Only two of them had
weapons. Puto had the knife. I didn't see it
before. I saw it after the stabbing. I don't know
the other guy who had the bat.

36

Rivera said that defendant did not possess any weapon. She said that Luis DeJesus pushed the door open to the apartment building at 197 Garside Street, and all of the men in his group, including defendant, ran in. She saw some of them run up the stairs, but she could not tell who was doing what once they got inside.

Rivera also described what happened when defendant, the DeJesus brothers, and the other two men exited the building. Luis DeJesus came out holding a bloody knife. Defendant, who looked upset, told Rivera that someone got stabbed. Defendant told her he was fighting with one of the members of the other group inside the building. At no time did she observe defendant in possession of any weapon, either before or after he entered the building, nor did she see any blood on defendant after he exited the building.

Investigator Sheila Hobson of the Essex County Prosecutor's Office took Rivera's statement. Rivera told Hobson that defendant was then in Puerto Rico. Hobson asked Rivera if she would request that defendant contact her. Rivera did so, as a result of which defendant voluntarily presented himself at the prosecutor's office in the company of Rivera. Hobson took defendant's statement as well.

Defendant's statement was consistent with the statement Rivera had given several days earlier. Defendant obviously knew that the police were aware of his presence during the altercation and that he was one of the individuals involved in the verbal dispute on the street and who then went back into the apartment building shortly afterwards. Undoubtedly, Rivera related to defendant what she had told Hobson in her statement. Consistent with Rivera's statement, defendant's statement was self-serving and exculpatory (except to the extent that he placed himself at the scene, which defendant knew was information the police already possessed).

He described an initial verbal dispute, followed by members of the other group chasing defendant and the DeJesus brothers swinging their belts at them. He then described how Rivera pleaded with him "to stay away and not go back there and look for more problems." He nevertheless went back with the DeJesus brothers and the other men. He denied possessing any kind of weapon

37

at any point during the episode, and he denied seeing any of his cohorts in possession of any weapons. He said he was being beaten up by a member of the other group in the first floor hallway. When asked whether he saw anyone run up the stairs to the second floor, defendant responded: "I couldn't see nothing. I was getting so beat up, I couldn't see nothing. I didn't see nobody get stabbed that day."

Defendant said when he left the building he and Rivera walked away from the scene. He went home, and soon afterwards left for his preplanned trip to Puerto Rico. He said he did not learn that anyone got stabbed until Rivera called him in Puerto Rico and informed him. He said he had not talked to anyone other than Rivera about the fight after it occurred. He denied seeing anyone bleeding in the course of the fight.

As we have stated, defendant did not testify at the Miranda hearing, nor did his trial counsel call Rivera or any other witnesses to testify. In his affidavit in support of his PCR petition, defendant said that Rivera told him Hobson wanted to speak to him and that the police knew that he did not stab anyone. In the affidavit, defendant suggested he was under pressure to give a statement because he and Rivera were told that if he did not do so, he would be arrested, and he would go to prison and never see his baby. Defendant contended that although he did not want to give a statement, Rivera, who remained present during the entire time Hobson interviewed him, prevailed upon him to do so. Throughout the affidavit, defendant stated several times that Hobson told him he was only a witness and not a suspect. However, at one point in the affidavit defendant stated that Hobson said he "was not the prime suspect and that she knows [defendant] did not kill anyone." (emphasis added).

Defendant contended in his affidavit that he informed his trial attorney before the Miranda hearing of the circumstances under which he gave the statement as described in his PCR affidavit. Yet, his attorney declined to call Rivera as a witness, and told defendant that "he was not allowing me to testify because he didn't think it would help and that he didn't prepare me to testify so if I testified and said something on the stand it could be used to hurt me in

trial." Defendant said in his affidavit he wanted to
testify, but his trial counsel "would not let [him]."

With respect to Rivera, defendant's assertions
about the matters to which she would have testified are
nothing more than the kind of "bald assertions" that
... are insufficient to provide a basis for
post-conviction relief or to warrant an evidentiary
hearing. The record contains no affidavit or
certification from Rivera. Indeed, it is more likely
that she would have testified in a manner consistent
with the statement she gave to the police, which did
not include the information about any threats by
Hobson, pressure by Rivera, or expressions by defendant
that he did not want to give a statement.

That brings us to defendant's argument pertaining
to the circumstances under which he did not testify at
the Miranda hearing. ...

In ruling upon the issue in the PCR proceeding,
the judge also reasoned that the claim was
substantively meritless because defendants rarely
testify at Miranda hearings, so trial counsel was
merely adhering to the common practice and did not
deviate from accepted standards of performance. The
judge concluded that second guessing such a strategic
decision could not provide a basis for relief in the
PCR proceeding.

The judge further noted that during the course of
the trial, defendant was very assertive and from time
to time spoke out, even when he should not have, on
matters of concern to him about the trial proceedings.
After the State rested, and defendant had the
opportunity to testify, he was questioned by his trial
counsel and by the court, and confirmed that he chose
not to testify at trial. Based upon this course of
events, the judge inferred that if defendant truly
wanted to testify at the Miranda hearing, he would have
made that known to the court.

We agree with the judge's analysis regarding
judicial scrutiny of trial counsel's performance under
the "highly deferential" standard applicable to
strategic decisions, which should not be subject to the
"distorting effects of hindsight." We temper this
agreement, however, because of defendant's statement in

his PCR affidavit that he wanted to testify and that trial counsel would not allow him to do so (as opposed to advising him not to do so). Even if this fact could be established at an evidentiary hearing, however, and if it could satisfy the first <u>Strickland</u> prong, we are not convinced that the second prong would be satisfied.

From our review of the record, we conclude there was not a reasonable probability that the result of the <u>Miranda</u> hearing would have been different if defendant had testified. The judge would have had to find credible defendant's proposed testimony that he was pressured into giving the statement because he was told he was not a suspect and because Rivera pressured him because of the alleged threat that if defendant did not give a statement he would be put in jail and would never see his baby. As we stated, defendant presented no corroboration in his written PCR submissions from Rivera as to the accuracy of these allegations. Presumably, therefore, she would not have testified accordingly at an evidentiary hearing, and the absence of her testimony would have certainly given rise to an adverse inference against the truthfulness of defendant's assertion. Further, the judge would have had to have found defendant's testimony more persuasive than that of Hobson and another detective who was present for part of defendant's statement. They testified that defendant was cooperative, was never threatened or coerced in any way, and voluntarily gave his statement after being fully advised of his <u>Miranda</u> rights.

Telling in defendant's PCR affidavit was the contention that Hobson told defendant that he was not a "prime" suspect, clearly signifying a distinction between those who actually did the stabbing and those who played a lesser role in the incident. In this regard, knowing that he was already placed at the scene and in the fracas, defendant's statement was completely exculpatory regarding his role as a potential accomplice. He denied possessing any weapons, seeing any of his cohorts in possession of any weapons, or knowing until days later when he was in Puerto Rico that anyone had even gotten stabbed. These self-serving statements were consistent with those previously given to the police by Rivera.

These circumstances militate against defendant's assertion of coercion. Before voluntarily presenting himself at the prosecutor's office, defendant knew that

the investigation by law enforcement placed him in the melee. Defendant's purpose in voluntarily going to the authorities to give a voluntary statement was to minimize his role and potential culpability in the incident.

We therefore conclude that the result of the Miranda hearing would not have been different had defendant testified. We also conclude that admission at trial of defendant's statement was not critical to the State's proofs and that, had there been no statement, the result of the trial would not have been any different.

B.

We now address defendant's second argument with regard to the Miranda hearing, that his appellate counsel was deficient for not raising on direct appeal the argument that the failure of the police to inform him before giving his statement that a criminal complaint had been signed charging him with murder constituted ineffective assistance of appellate counsel. As we stated, A.G.D. was decided on October 9, 2003, while defendant's appeal was pending. His appeal was scheduled for submission to the court on December 17, 2003. Presumably, the parties had already submitted their briefs before the A.G.D. decision. However, after briefs are filed, parties are permitted to communicate with the court, calling the court's attention to the significance of relevant cases decided subsequent to the filing of the brief. R. 2:6-11(d). Defendant argues that failure of his appellate counsel to issue such a communication to the court regarding A.G.D. constituted deficient conduct.

...

... In our view, the A.G.D. principles were not violated here. We do not read A.G.D. as prescribing the immutable bright-line rule defendant suggests.

In A.G.D., the defendant was questioned regarding "allegations of sexual abuse that had been asserted against him, but the detective did not specify the charges." An arrest warrant had already been issued against the defendant, but the police did not advise him of that fact. Defendant then confessed to the

41

crime. The Court held that "[w]ithout advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of his rights, regardless of other factors that might support his confession's admission."

In a subsequent case, however, a panel of this court distinguished A.G.D. in circumstances in which the police advised the defendant they had a warrant for his arrest and told him he was being taken to the homicide unit, but did not tell him he had been arrested for the murder of the victim. State v. Henderson, 397 N.J.Super. 398, 404, 937 A.2d 988 (App.Div.), certif. granted and certif. denied, 195 N.J. 521 (2008). We declined to extend the A.G.D. principles in those circumstances, where "defendant well-understood why he was arrested."

We view the case before us as materially similar to Henderson. Defendant "well-understood" why he was giving a statement. He was doing so to minimize his role in the criminal episode, with full knowledge that the police investigation had already placed him in the altercation, both the initial confrontation on the street and the follow-up fight inside the apartment building.

...

In other words, when defendant gave his statement to the police on August 19, 1998, he was not telling them anything they did not already know. He did so with full knowledge that he was there because the police already knew that information about his role in the incident. He voluntarily presented himself at the prosecutor's office and, after being Mirandized, voluntarily gave the self-serving statement in an effort to minimize his role in the crime. Under these circumstances, defendant was not deprived of his ability to knowingly and voluntarily waive his Miranda rights. As in Henderson, we conclude that notwithstanding the failure of the police to inform defendant of the criminal complaint that had been issued against him, the A.G.D. principles do not require suppression of defendant's statement.

State v. Rodriguez, 2010 WL 4226170, *7-17 (Oct. 27, 2010)
(citations omitted).

The Counsel Clause of the Sixth Amendment provides that a
criminal defendant "shall enjoy the right ... to have the
Assistance of Counsel for his defence."  U.S. Const. amend. VI.
The right to counsel is "the right to effective assistance of
counsel."  McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)
(emphasis added).  See also Strickland v. Washington, 466 U.S.
668, 687, 694 (1984) (detailing a two-pronged approach to
evaluating claims of ineffective assistance of counsel).

The Supreme Court has held that the Due Process Clause of
the Fourteenth Amendment guarantees a defendant the effective
assistance of counsel on a first direct appeal as of right.
Evitts v. Lucey, 469 U.S. 387 (1985).  The Strickland standard
for effective assistance of counsel applies to appellate counsel.
See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004).

Here, the Appellate Division correctly identified and
applied the principles governing Petitioner's numerous claims of
ineffective assistance of counsel.  Petitioner is not entitled to
relief on these claims.

F.   Sufficiency of the Evidence

Petitioner asserts that the conviction is against the weight
of the evidence and that the trial court erred in denying his
motion for acquittal.

The Appellate Division rejected this claim on direct appeal.

All defendants assert that there was insufficient evidence to support their convictions and that the judge erred in denying their motions for a judgment of acquittal and new trial. The "road test" for determination of a motion to acquit "is whether the evidence at that point is sufficient to warrant a conviction of the charge involved." State v. Reyes, 50 N.J. 454, 458 (1967). Specifically, the appellate court is constrained to sustain a trial judge's denial of a R. 3:18-1 motion to acquit at the close of the State's case if, "'viewing the State's evidence in its entirety, be that evidence direct or circumstantial,'" and giving the State the benefit of all reasonable inferences, "'a reasonable jury could find guilt of the charge beyond a reasonable doubt.'" State v. Josephs, 174 N.J. 44, 80 (2002) (quoting Reyes, supra, 50 N.J. at 459).

 ...

On appeal, Rodriguez argues that the proofs in this case respecting his actions did not constitute any criminal offenses and the State failed to provide any evidence regarding a conspiracy to commit any of the acts alleged in the indictment. ...

Rodriguez and his co-defendants were charged as either principals or accomplices. Whether Rodriguez actually stabbed one of the victims, or not, is largely irrelevant, since the evidence showed him to be at least an accomplice. N.J.S.A. 2C:2-6(a) provides that an individual can be guilty of an offense committed "by the conduct of another person for which he is legally accountable." Moreover, a person is legally accountable for the conduct of another when he is "an accomplice of such other person in the commission of an offense," or when he is "engaged in a conspiracy with such other person." N.J.S.A. 2C:2-6(b)(3) and (4). An individual is an accomplice if, "[w]ith the purpose of promoting or facilitating the commission of the offense, he ... [a]ids or agrees or attempts to aid such other person in planning or committing it." N.J.S.A. 2C:2-6(c)(1)(b).

Thus, under N.J.S.A. 2C:2-6, accomplice liability attaches when a defendant shares the purpose of the

principal who commits the offense charged, <u>State v. Norman</u>, 151 N.J. 5, 32 (1997), and the defendant "actually foresee[s] and intend[s] the result of his or her acts," <u>State v. Bridges</u>, 133 N.J. 447, 456 (1993). It is a well established principle that "distinctions between the culpability and punishment of a principal and accomplice have been abolished, and that an accomplice has equal culpability and is subject to the same punishment as a principal in the crime's commission." <u>In re D.A.C.</u>, 337 N.J. Super. 493, 496-97 (App. Div. 2001).

Here, the record demonstrates sufficient evidence of a conspiracy among the defendants to support the notion that Rodriguez was also an accomplice of the DeJesus brothers, and was, therefore, liable for any offenses committed by them.  Not only was there ample evidence to establish that Luis and Alexis were actually involved in the stabbings, but also that Rodriguez aided or attempted to aid them in the commission of the offenses with which they were charged.  The evidence established that Rodriguez aided or attempted to aid the others by brandishing a stick and using it at least against Claudio.  The fact that there was no independent proof as to who was responsible for Mario's death is of no moment.  Simply stated, there was sufficient evidence presented upon which a jury could find beyond a reasonable doubt that all defendants were guilty either as accomplices or principals.

To establish that a defendant was guilty of conspiracy, the State was required to prove beyond a reasonable doubt that defendant "agree[d] with such other person or persons" to commit the crime, or "agree[d] to aid such other person or persons" in that crime.  N.J.S.A. 2C:5-2a(1) and (2).  The focus of the inquiry is not on the existence of an actual agreement between the parties, but on defendant's intent.  <u>State v. Del Fino</u>, 100 N.J. 154, 160 (1985); Cannel, <u>New Jersey Criminal Code Annotated</u>, comment 4 on N.J.S.A. 2C:5-2 (2000).

In <u>State v. Graziani</u>, 60 N.J.Super. 1, 13 (App. Div. 1959), <u>aff'd o.b.</u>, 31 N.J. 538, <u>cert. denied</u>, 363 U.S. 830, 80 S. Ct. 1601, 4 L. Ed. 2d 1524 (1960), the court noted that conspiracy is "rarely capable of proof through direct evidence."  The State may prove

conspiracy solely through circumstantial evidence. State v. Hardison, 99 N.J. 379, 384-85 (1985); State v. Ball, 268 N.J. Super. 72, 109 (App. Div. 1993), aff'd, 141 N.J. 142 (1995), cert. denied, 516 U.S. 1075, 116 S. Ct. 779, 133 L. Ed. 2d 731 (1996). Moreover, "a common purpose and plan may be inferred from a development and a collocation of circumstances." State v. Naglee, 44 N.J. 209, 227 (1965), rev'd on other grounds sub nom., Garrity v. New Jersey, 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967).

Defendants first confronted Mario and Rodrigo when they either asked for a cigarette or money (State's version) or when Mario and Rodrigo insulted the two women in their company (defendants' version).

Following this initial encounter, defendants went home, armed themselves, recruited others, and returned to Alfonso's apartment building where they engaged in a brutal assault resulting in death and severe injuries. The evidence established that Rodriguez participated in this planned and vicious attack and showed his intent to do so by commenting that he had to go. Concluding that there was sufficient evidence to submit the case to the jury, the trial judge correctly observed that defendants were

> armed with these weapons, they are deadly weapons, they are returning, and they have in mind, the jury can fairly infer, purpose to kill, purpose to do serious bodily injury that will result in death. And they make a plan to do that. As a matter of fact, Sergio Rodriguez acknowledges the plan. He says that he has to go back with them, that he cannot avoid going back. He says it to Yvalisse Rivera.

(Answer, Ex. 7, Opinion of Appellate Division at 19-24.)

A claim that the jury's verdict was against the weight of the evidence raises a due process concern. Only where, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" should

the writ issue.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).
This standard must be applied "with explicit reference to the
elements of the criminal offense as defined by state law."
Jackson, 443 U.S. at 324, n.16.  See also Orban v. Vaughn, 123
F.3d 727 (3d Cir. 1997), cert. denied, 522 U.S. 1059 (1998).  As
noted above, state court factual determinations are presumed to
be correct.  See Werts v. Vaughn, 228 F.3d 178, 186 (3d Cir.
2000).

Here, the state-law standard applied by the Appellate
Division was neither contrary to nor an unreasonable application
of the Jackson standard.  The Appellate Division applied the
standard with explicit reference to the elements of the offenses
of conviction.  The decision of the Appellate Division was not
unreasonable in light of the evidence before it, as set forth at
length in the Appellate Division's Opinion.  Petitioner is not
entitled to relief on this claim.

G.   Cumulative Error

Petitioner asserts that cumulative errors rendered the trial
unfair.  The Appellate Division rejected this claim as so
meritless that it did not warrant discussion in a written
opinion.  State v. Rodriguez, 2010 WL 4226170, *17 (Oct. 27,
2010).

Under certain circumstances, cumulative errors may demonstrate that a criminal defendant was denied a fair trial, even though individual errors do not justify relief.

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Albrecht v. Horn, 471 F.3d 435, 468 (3d Cir. 2006). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008).

This Court agrees with the Appellate Division that the claim of "cumulative error" is patently meritless.  Petitioner is not entitled to relief on this claim.

H.    Excessive Sentence

Petitioner asserts that his sentence is manifestly excessive.[11]  In state court, Petitioner asserted that the trial judge improperly identified and balanced the aggravating and mitigating factors.  The Appellate Division summarily rejected

---

[11] On the felony murder count, Petitioner was sentenced to a term of 30 years' imprisonment, with a 30-year parole disqualifier.  On the second-degree aggravated assault count, Petitioner was sentenced to a consecutive term of seven years' imprisonment, with an 85% parole disqualifier.  On the fourth-degree aggravated assault counts, Petitioner was sentenced to consecutive terms of nine months' imprisonment.

48

this claim on direct appeal.  (Answer, Ex. 7, Opinion of
Appellate Division at 25, 30-31.)

A federal court's ability to review state sentences is
limited to challenges based upon "proscribed federal grounds such
as being cruel and unusual, racially or ethnically motivated, or
enhanced by indigencies."  See Grecco v. O'Lone, 661, F.Supp.
408, 415 (D.N.J. 1987) (citation omitted).  Thus, a challenge to
a state court's discretion at sentencing is not reviewable in a
federal habeas proceeding unless it violates a separate federal
constitutional limitation.  See Pringle v. Court of Common Pleas,
744 F.2d 297, 300 (3d Cir. 1984).  See also 28 U.S.C. § 2254(a);
Estelle v. McGuire, 502 U.S. 62, 67 (1991); Lewis v. Jeffers, 497
U.S. 764, 780 (1990).

"The Eighth Amendment, which forbids cruel and unusual
punishments, contains a 'narrow proportionality principle' that
'applies to noncapital sentences.'" Ewing v. California, 538
U.S. 11, 20 (2003) (citations omitted).  The Supreme Court has
identified three factors that may be relevant to a determination
of whether a sentence is so disproportionate to the crime
committed that it violates the Eighth Amendment:  "(1) the
gravity of the offense and the harshness of the penalty; (ii) the
sentences imposed on other criminals in the same jurisdiction;
and (iii) the sentences imposed for commission of the same crime
in other jurisdictions."  Solem v. Helm, 463 U.S. 277, 292

(1983).  More recently, Justice Kennedy has explained that Solem does not mandate comparative analysis within and between jurisdictions, see Harmelin v. Michigan, 501 U.S. 957, 1004-05 (Kennedy, J., concurring in part and concurring in judgment), and he has identified four principles of proportionality review--"the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors"--that "inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime," id. at 1001 (citation omitted) quoted with approval in Ewing, 538 U.S. at 23.

Here, Petitioner appears to challenge his sentence solely on state law grounds, which do not provide a basis for federal habeas relief.  In any event, he has failed to establish that his sentence violates any federal constitutional limitations. Certainly, the sentence is not "grossly disproportionate" to the crimes.  Accordingly, Petitioner is not entitled to relief on this claim.

IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Jurists of reason would not disagree with this Court's resolution of Petitioner's claims.  Accordingly, no certificate of appealability will issue.

V.   CONCLUSION

For the reasons set forth above, the Petition will be denied.  An appropriate order follows.


                                     s/ Faith S. Hochberg
                                     Faith S. Hochberg
                                     United States District Judge
Dated: March 4, 2013

51